United States District Court
District of Connecticut
FILED AT   BRIDGEPORT
8/12/2010
Roberta D. Tabora, Clerk
By
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SUSAN GODFREY                    :
                                 :
v.                               :    CIV. NO. 3:09CV1172 (DJS)
                                 :
MICHAEL J. ASTRUE,               :
COMMISSIONER, SOCIAL SECURITY    :
ADMINISTRATION                   :
                                 :
                                 :

## RECOMMENDED RULING ON CROSS MOTIONS

Susan L. Godfrey brings this action under Section 205(g) of
the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking
review of a final decision of the Commissioner of Social Security
that Ms. Godfrey was not entitled to a period of disability,
Disability Insurance Benefits ("DIB"), and Supplemental Security
Income ("SSI").  The Administrative Law Judge ("ALJ") concluded
that despite plaintiff's impairments, she had the residual
functional capacity ("RFC") to perform light work with additional
limitations which, taken in conjunction with plaintiff's age,
education, and work experience, indicates that there are jobs
existing in significant numbers in the national economy that
plaintiff can perform.  Plaintiff challenges the ALJ's
conclusion, arguing that she suffers from hypertrophic hip spurs;
multi-level disc disease, including bulging discs in the thoracic
and lower spine; carpal tunnel syndrome; arthritis; chronic pain;
high blood pressure; diabetes; and obesity.

For the reasons discussed below, plaintiff's Motion for an Order Reversing the Decision of the Commissioner **[Doc. #10]** is **DENIED,** and defendant's Motion to Affirm the Decision of the Commissioner **[Doc. #13]** is **GRANTED.**

ADMINISTRATIVE PROCEEDINGS

Ms. Godfrey filed an application for Supplemental Security Income Benefits ("SSI") and Disability Insurance Benefits ("DIB") on January 8, 2007. (Certified Transcript of Record, compiled on September 18, 2009, hereinafter "Tr.") (Tr. 118-124, 125-130). She alleged disability commencing March 1, 2005 (Tr. 118) due to "tumor on back, spurs in hips, [and] arthritis in hand and back." (Tr. 62). Her applications were denied initially on February 17, 2007 (Tr. 79-82, 83-85), and again by a federal reviewing official on September 19, 2007. (Tr. 68-78). ALJ James E. Thomas held a hearing on December 4, 2008, at which Ms. Godfrey testified.[1] (Tr. 16-59). On February 4, 2009, the ALJ issued a decision finding that Godfrey was not disabled at any time during the relevant period. (Tr. 4-15). The Decision Review Board selected Ms. Godfrey's claim for review but did not complete its review during the time allowed, thus rendering the ALJ's decision the final decision of the Commissioner.[2] (Tr. 1-3). This case is

_____

[1]Plaintiff was represented by counsel before the ALJ and on this appeal.

[2]Plaintiff's case was selected for a pilot program under which, in randomly-selected cases, the Commissioner is testing

now ripe for review under 42 U.S.C. § 405(g).

STANDARD OF REVIEW

The Social Security Act provides for judicial review of the Commissioner's denial of benefits. 42 U.S.C. §1383(c)(3). This is not review de novo -- the Court may not decide facts, re-weigh evidence or substitute its judgment for that of the Commissioner. See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993). Primarily, the Court reviews the decision to determine whether the Commissioner applied the correct legal standard. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); see also Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987) (where the ALJ failed to apply correct legal principles, his finding cannot be upheld even if there is substantial evidence for it).

Secondly, the Court reviews whether the Commissioner's determination was supported by substantial evidence. Tejada, 167 F.3d at 773. "Substantial evidence" is evidence that a reasonable mind would accept as adequate to support a conclusion; it is "more than a mere scintilla." Richardson v. Perales, 402

---

new procedures in the administrative review process. See 20 C.F.R. §405.1. In such cases, a claimant whose claim has been denied may request review by a federal reviewing official, rather than reconsideration by the Commissioner. See C.F.R. §405.401 et seq. If the federal reviewing official determines that the claimant is not disabled, the claimant then may request a hearing before an administrative law judge. See 20 C.F.R. §405.301 et seq. A claimant dissatisfied with the administrative law judge's decision then may request review by the Decision Review Board, rather than the Appeals Council. See 20 C.F.R. §405.401 et seq.

U.S. 389, 401 (1971), quoted in Pollard v. Halter, 377 F.3d 183, 188 (2d Cir. 2004).  The Court considers the entire administrative record, including new evidence submitted to the Appeals Council following the ALJ's decision.  Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  To enable a reviewing court to decide whether the determination is supported by substantial evidence, the ALJ must set forth the crucial factors with sufficient specificity.  See Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).  This includes a determination that the testimony of any witness is not credible.  See Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  Gonzalez v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977).  The court may not decide facts, re-weigh evidence, or substitute its judgment for that of the Commissioner.  Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993).  The court's responsibility is always to ensure that a claim has been fairly evaluated.  Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983).

Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold the ALJ's decision "creates an unacceptable risk that a claimant will be deprived of the right

to have her disability determination made according to correct legal principles." Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1987) (quoting Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)). To enable a reviewing court to decide whether the determination is supported by substantial evidence, the ALJ must set forth the crucial factors in any determination with sufficient specificity. See Ferraris, 728 F.2d at 587. Thus, although the ALJ is free to accept or reject the testimony of any witness, a finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible review of the record. Bowen, 859 F.2d at 260-61. Moreover, when a finding is potentially dispositive on the issue of disability, there must be enough discussion to enable a reviewing court to determine whether substantial evidence exists to support that finding. Peoples v. Shalala, 1994 WL 621922, at *4 (N.D. Ill. 1994); see generally Ferraris, 728 F.2d at 587.

ELIGIBILITY FOR BENEFITS

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The SSA has promulgated regulations prescribing a five-step analysis for evaluating disability claims. In essence, the Commissioner must find a claimant disabled if he or she determines "(1) that the claimant is not working, (2) that he or she has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in her prior type of work, and (5) there is not another type of work the claimant can do." Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); see also Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); 20 C.F.R. §§ 404.1520(b-f), 416.920(b-f).

The burden of proving initial entitlement to disability benefits is on the claimant. Aubeuf v. Schweiker, 649 F.2d 107, 111 (2d Cir. 1981). The claimant satisfies this burden by showing that impairment prevents return to prior employment. Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983). The burden then shifts to the Commissioner, who must show that the claimant is capable of performing another job that exists in substantial numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

FACTUAL BACKGROUND

Education and Employment History

At the onset of her alleged disability, March 1, 2005, plaintiff was thirty-seven years old. (Tr. 13). She completed high school and two years of college (at two separate institutions), but it is not clear whether she received one or more associate's degrees.[3] (Tr. 24, 42).

Plaintiff's last work was a daycare she ran out of her home (Tr. 43); she has been unemployed since 2006 (Tr. 164). Previously, she was a daycare provider at the YMCA and the South End Community Center and a receiver at Bradlee's. (Tr. 165-167).

Plaintiff's Activities of Daily Living

On January 7, 2007, plaintiff filled out an "Activities of Daily Living" form. (Tr. 135-142). She indicated that a typical day began by readying herself and preparing her daughter for school. (Tr. 135). During the day, she wrote that she did household chores with frequent breaks. (Tr. 135). After picking her daughter up from school, she described making supper[4], feeding

---

[3]Plaintiff testified at the ALJ hearing that she attended Hartford (written "Harvard" in the transcript) College for Women in Hartford and then Goodwin College. (Tr. 24). She indicated that she attended each for a year. (Tr. 24). Later at the hearing, plaintiff stated, "I went to the college to get a CDA, which is an associate degree. The first time was the ECE, which is early childhood education degree. And then I went to Goodwin College to get a CDA so-which is an associate's degree, so I became a pre-school teacher for three year olds." (Tr. 42).

[4]She indicated that preparing meals took about half an hour to one hour. (Tr. 137). She described changes in cooking habits since her conditions began: "When I can't stand too long when my

her pets, helping her daughter with homework, and playing with her. (Tr. 135).

Plaintiff indicated that she left her house every day, walking or taking public transportation[5]. (Tr. 138). Plaintiff wrote that she did grocery shopping once a month for two hours, using "the shopping cart to help me walk." (Tr. 139). Plaintiff indicated that she cleaned, did laundry, made beds, vacuumed, dusted and washed floors three times a week. (Tr. 138). She explained that household chores took several hours to complete because she had "to sit then start again then sit and start again." (Tr. 138). She had "someone rake and shovel snow [because] I can't lift or bend without severe pain." (Tr. 138).

Plaintiff indicated she spent time with friends at their homes and her house and talked on the phone. (Tr. 140). Since her conditions began, plaintiff wrote that she could no longer "walk long in a mall or go to fairs or go on rides [or] play ball or physical things." (Tr. 140). For her hobbies and interests, plaintiff listed "reading, watching TV and my daughter." (Tr. 139). She reported that she "just can't play any physical activities and I can't sit and play on the floor or stand too long

_____

back hurts, I make easy meals, usually microwave stuff." and that "I can prepare meals only when my back doesn't hurt." (Tr. 137).

[5]Plaintiff does not have driver's license or a car. (Tr. 138).

and don't go for walks."  (Tr. 139).

Plaintiff indicated that she did not have a problem with personal care and did not need any special reminders to take care of her personal grooming or to take medicine.  (Tr. 136).  She also indicated that she was able to pay bills, count change, and use a checkbook/money order; she checked off that her ability to handle money had not changed since the onset of her conditions. (Tr. 139).  Plaintiff wrote that she could pay attention "all the time" and could finish what she started, "depend[ing] on my pain." (Tr. 141).  Also, plaintiff wrote that she could follow written and spoken instructions well and could get along well with authority figures.  (Tr. 141).  She checked off that she had never been fired or laid off and reported that she handled stress and changes in routine well.  (Tr. 141).

However, plaintiff wrote that her conditions affected her sleep because she would wake-up "stiff and in pain" (Tr. 136), and that she had "a lot of difficulties with coldness" in the winter (Tr. 142).  She further described how her symptoms interfered with daily activities:

> My hand is always numb and has tingleness
> [sic] in the hand and fingers[;] my hand and
> hip and legs are always tired.  My back burns
> and hurts whether I do anything or not.  The
> mornings when I get up I have to roll myself
> because of the stiffness and pain of my back
> and left side of my body.  I walk like a
> ninety-year-old woman sometimes.

(Tr. 142).

Plaintiff indicated that her conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and use her hands[6]. (Tr. 140). Further, she believed she could only lift five pounds, walk ten minutes, sit twenty minutes, and bend for a "couple of minutes." (Tr. 140). She found that she had little use of her left hand. (Tr. 140).

Plaintiff listed four daily medications: Percocet, Soma, Ibuprofen, and Vicodin[7]. (Tr. 137). She added that she had diabetes, for which she took medicine twice a day. (Tr. 142).

Medical Records

Doctor Vivian Iloje (February 2005 to November 2006)

On February 17, 2005, plaintiff saw Dr. Vivien Iloje at East Hartford Community Health Care for back pain, which plaintiff reported had been ongoing since July 2000. (Tr. 230). Dr. Iloje noted lumbar tenderness and prescribed Flexeril and Soma, ordered x-rays, and gave plaintiff information about back exercises. (Tr. 230). The same day, plaintiff called the doctor's office, reporting that the Flexeril was making her nauseated; the following day, Dr. Iloje prescribed Percocet instead. (Tr. 229).

On February 18, 2005, Connecticut Valley Radiology performed

---

[6]Plaintiff wrote that one of her hands "is wors[e] than the other." (Tr. 140).

[7]Plaintiff noted that she was previously taking Vicodin but that her doctor changed her prescription to Percocet. (Tr. 137).

an x-ray of plaintiff's lumbar spine; the five-view lumbar spine series was unremarkable. (Tr. 228). On February 28, 2005, patient refilled her Percocet prescription. (Tr. 227). On March 23, 2005, plaintiff reported that her pain was reasonably controlled with medication, and Dr. Iloeje refused to refill her Percocet prescription until it was due. (Tr. 226). On April 13, 2005, Dr. Iloeje recorded that she had decreased plaintiff's dosage of Percocet because her x-rays were normal. (Tr. 224).

On May 2, 2005, plaintiff reported that she was taking Motrin, but it was not working. (Tr. 220). Dr. Illoeje prescribed Darvocet. (Tr. 220). On May 20, 2005, plaintiff reported that she was still having back pain that was worse after prolonged standing; the pain would radiate to her knees, she stated, although she continued to have normal leg movement. (Tr. 218). Dr. Iloeje noted that plaintiff had lumbar tenderness but a normal gait. (Tr. 218). In addition, she denied plaintiff's request for Percocet and ordered a magnetic resonance imaging (MRI) scan. (Tr. 217).

On June 7, 2005, plaintiff underwent an MRI scan of her lumbosacral spine, which revealed a mild diffuse disk bulge at L3-4 with no neural foraminal or central canal stenosis. (Tr. 216). After reviewing the MRI results, Dr. Iloeje advised plaintiff that she should undergo physical therapy. (Tr. 215). On June 28, 2005, plaintiff requested Percocet, but Dr. Iloeje responded that

there were no significant MRI findings to merit it. (Tr. 214).
Progress notes in June of 2005 mention a back tumor, but it is
unclear whether the condition was diagnosed by Dr. Iloje. (Tr.
213).

On August 1, 2005, plaintiff reported that she was not
attending physical therapy, and Dr. Iloeje noted that plaintiff
was obese. (Tr. 211). On September 26, 2005, Dr. Iloeje denied
plaintiff's request for Percocet, instead refilling plaintiff's
prescription for Darvocet. (Tr. 209). Plaintiff had another
appointment on October 18, 2005.[8] (Tr. 198).

On January 24, 2006, plaintiff reported that she had fallen
down the stairs the day before and was applying a heating pad for
back pain. (Tr. 205). Dr. Iloeje noted bruising on plaintiff's
back and ordered x-rays at plaintiff's request. (Tr. 205).
Plaintiff underwent an x-ray of her lumbar spine on January 31,
2006; results indicated no abnormalities. (Tr. 203) That same
day, plaintiff requested stronger pain medication, claiming her
current medication was not working. (Tr. 204). It does not
appear that Dr. Iloeje changed the prescription, but she did
comment that plaintiff really should continue physical therapy and

---

[8]On the same day, plaintiff reported that a pharmacist had
called her that week and had told her that a covering doctor had
ordered Tramadol, a pain medication, for plaintiff. Plaintiff
reported that she had told the pharmacist that this was a mistake
and that someone else must be using her name and birth date to
get medication. (Tr. 208).

should do no heavy lifting.  (Tr. 204).

An MRI scan of plaintiff's lumbar spine taken on March 22, 2006[9], revealed multilevel disc desiccation in the distal thoracic spine, as well as at L4-5.  (Tr. 195).  In addition, it revealed a questionable small midline annular tear at L4-5 but did not find any evidence of disc herniation or nerve root impingement.  (Tr. 195).

Progress note records from East Hartford Community Health Care indicate that, following plaintiff's visit in late January 2006 due to her fall down the stairs, plaintiff did not return to until October 24, 2006.  (Tr. 201).  At her last visit on November 2, 2006, plaintiff continued to complain of back pain.  (Tr. 200).

Doctor Eva Murcia (September 2006 to February 2007)

From September 20, 2006 through February 21, 2007, plaintiff received treatment from Dr. Murcia at Meriden Health Care.[10]  (Tr. 234-248).  On September 20, 2006, plaintiff saw Dr. Murcia to discuss medication.  (Tr. 248).  On October 4, 2006, plaintiff received a prescription for Vicodin; the progress note for that visit described plaintiff's "addictive potential."  (Tr. 247). When plaintiff returned on October 26, 2006, she complained of swelling and numbness.  (Tr. 246).  On November 8, 2006, plaintiff

---

[9]The MRI was ordered by Dr. Eva Murcia.

[10]Dr. Murica's treatment notes are difficult to read and at times illegible.  (Tr. 234-248).

13

received a refill on her medications. (Tr. 245). Plaintiff had another appointment on December 5, 2006. (Tr. 244).

On December 21, 2006, x-rays of plaintiff's left hip and SI joint found minimal degenerative change with small marginal hypertrophic spurs; however, the radiologist performing the procedure concluded that the examination was "essentially negative." (Tr. 241). On January 3, 2007, plaintiff had an appointment to discuss her x-ray results. (Tr. 240). Additional x-rays of plaintiff's hands and wrists taken on January 13, 2007 revealed no erosive changes or degenerative changes indicative of arthritis.[11] (Tr. 239).

On January 23, 2007, plaintiff received prescription refills, including one for Vicodin. (Tr. 237). At a visit on February 13, 2007, plaintiff complained of sinus congestion and also received a prescription for Vicodin. (Tr. 235). On February 21, 2007, Dr. Murcia prescribed several medications for plaintiff, including Percocet. (Tr. 234).

On February 5, 2007, Dr. Murcia ordered an electromyography (EMG) study of plaintiff's left hand (Tr. 236), which was completed on March 9, 2007, revealing left median neuropathy at the wrist (e.g. carpal tunnel syndrome) of moderate severity (Tr.

---

[11]"Arthritis" is mentioned under "Past Medical History" on several Progress Notes, but there is no indication that Dr. Murcia diagnosed or treated plaintiff for this condition. (Tr. 244).

249).

Medical Report for Incapacity[12] Completed by Dr. Eva Murcia

On January 16, 2007, Dr. Murcia completed a Medical Report for Incapacity, regarding plaintiff's ability to work. (Tr. 231-233). She recorded that plaintiff had a history of back, leg, hip and hand pain. (Tr. 231). She found that plaintiff had a significant medical condition that prevented her from working. (Tr. 231). Additionally, she wrote that the prognosis for plaintiff is "fair to poor" but that while the plaintiff might be able to do sedentary work "someday" (Tr. 232), she was unable to work while being treated (Tr. 233).

Medical Evaluation Completed by Dr. Lewis Goldfine

On September 12, 2007, Agency Physician Dr. Lewis Goldfine reviewed the evidence in the record and completed a case analysis. (Tr. 252). The evaluation first focused on plaintiff's complaints of hip and back pain and arthritis of the hands. Dr. Goldfine noted that plaintiff reported that she cooks, does housework, walks and uses public transportation. (Tr. 252). He indicated that although plaintiff complained of pain and swelling in her hands, the x-ray of both hands and wrists were "normal." (Tr. 252). He noticed that the EMG/NGS on March 9, 2007 found left median neuropathy at the wrist with prolonged motor and sensory

---

[12]The report is handwritten and difficult to read. (Tr. 231-233).

latencies. (Tr. 252). In addition, two MRIs in 2005 showed a disc bulge at L4-5. (Tr. 252). Finally, he indicated that the hip x-ray was "normal with small marginal spurs only." (Tr. 252). Dr. Goldfine analyzed plaintiff's medical records as follows:

> This claimant has multiple allegations including arthritis and back pain. X-rays of the left hip and both hands show no evidence of arthritis. Imaging, which includes several MRI studies show mild degenerative changes in the lumbar spine but no disc herniation or nerve root compromises. Electrodiagnostic studies show evidence of carpal tunnel syndrome, consistent with complaints. She is probably severely obese and back and hip complaints would be reasonable on a mechanical basis, but there is a confusing record for height . . . . The evidence is insufficient to evaluate credibility and function as there are <u>no recent detailed clinical findings on file</u>. A detailed musculoskeletal exam is suggested with current measured height and weight; graded strength, ROM of the spine and joints, SLR (sitting and supine), gait, sensation, and reflexes.[13]

(Tr. 252) (emphasis added).

<u>ALJ Hearing Testimony</u>

> <u>Plaintiff's Testimony</u>

On February 4, 2009, plaintiff offered testimony at the

---

[13]Dr. Goldfine wrote that in some records plaintiff's height was listed as "5'" while in others it was listed as "5'11"." However, the EMG Report from Hartford Hospital indicates plaintiff is 5'11" (Tr. 249) and the Federal Reviewing Officer wrote in the Explanation of his decision that he called the plaintiff's home and verified that she is 5'11" (Tr. 72).

hearing regarding her impairments and conditions.[14] (Tr. 16-59).
She was represented by counsel. Vocational Expert Renee Jubree
was also present at the hearing and testified.

Plaintiff testified that she applied for Social Security in
2007, after she last worked, and has not worked since. (Tr. 25).
She testified that her pain was located "in my back and my hips
and my knees" and also "my left hand . . . if I don't move my
hands constantly then they lock because of the arthritis and
stuff." (Tr. 26). She testified that pain prohibited her from
working. (Tr. 26-27).

When asked to specifically describe her conditions, plaintiff
testified: "I have a spur in my hip. I have arthritis. I have
deteriorating of the discs, not all of them, certain ones . . . .
It's all in the lower back. I had a tumor on the lower back. I
have carpal tunnel in my hand. I have nerve damage in one of my
hands . . . I have a tear, it's an anal tear at the bottom of your
spine by where your butt is." (Tr. 27-28).

Specifically concerning the hip spurs, the plaintiff
testified that "they just shoot pain into my hips--like if I walk
or I bend." (Tr. 28). As for her back, plaintiff testified that
"there's a lot of burning. There's a lot of numbness. It feels

---

[14]Plaintiff completed Disability Reports on January 29, 2007
(Tr. 146-152), April 10, 2007 (Tr. 154-162), April 23, 2007 (Tr.
152-172), December 6, 2007 (Tr. 175-182), December 8, 2007 (Tr.
183-185), and January 8, 2008 (Tr. 142-145) and testified at the
hearing consistent with her reported symptoms.

like that somebody's like punching me in the back." (Tr. 28-29). She testified that the pain occurred without apparent cause: "It could be if I walk, you know, sit too long, if I walk--if I don't move, if I sit and don't move a little bit it bothers me. It's just if I bend down and pick something off the floor, it all depends." (Tr. 29). In addition, plaintiff testified that the carpal tunnel in her left hand affected her everyday activities because her hands "get numb and they burn and I can't have feeling," which happens hourly, every day. (Tr. 31).

Plaintiff testified that Dr. Murcia diagnosed her with nerve damage in both hands, although "one is mild and the other one's worser [sic]." (Tr. 47). Plaintiff testified that the pain was worse in her left hand and that her right hand is her dominant hand. (Tr. 47). When asked what caused the pain in her hands, plaintiff stated that she thought it was from the carpal tunnel and the nerve damage. (Tr. 47). In her testimony, plaintiff stated that at one point, Dr. Murcia talked to her about the potential of having an operation on her left hand, but that surgery was no longer "on the table." (Tr. 48).

Plaintiff testified that she took Percocet four times a day and Somas "about six times a day." (Tr. 40). The medication worked "about seventy percent" of the time, she stated. (Tr. 40). Without medication, plaintiff testified her pain level would be a ten out of ten; with it, her pain level was "eight and a half."

(Tr. 40-41).

The ALJ noted that there were no medical records after early 2007 and asked plaintiff if she was still being seen by the same physicians. (Tr. 45). Plaintiff responded that she still got pain medication and saw a doctor "every two weeks." (Tr. 45). Plaintiff stated that her new doctor was Dr. Najuko. (Tr. 45). The ALJ noted that there were no updated medical records; plaintiff's attorney responded that Dr. Najuko had been treating the plaintiff only recently (Plaintiff stated for "about maybe six months"). (Tr. 45-46). Plaintiff explained that Dr. Najuko had taken over for Dr. Murcia, her previous doctor. (Tr. 46). When pressed for specifics, plaintiff stated she began seeing Dr. Najuko in approximately July, 2008. (Tr. 46). Plaintiff testified that Dr. Najuko was providing the same type of care as Dr. Murcia, writing prescriptions for her pain, diabetes and cholesterol medication. (Tr. 46). The ALJ asked about Dr. Najuko's specialty and plaintiff responded that he was a primary care doctor. (Tr. 46-47).

In terms of daily activities, plaintiff explained that because she lived in a trailer, she did not have to walk up any stairs at home. (Tr. 32). She also stated that her boyfriend did "ninety percent" of the cooking, vacuuming, laundry, and outside maintenance. (Tr. 33). She helped him by folding clothes because "I can sit down and do it." (Tr. 33). Her mother also helped

with the shopping, and her stepfather helped with outside maintenance. (Tr. 33). Plaintiff stated that because her daughter was nine years old, she "basically" took care of herself because she could take her own shower, dress herself and put on her shoes; plaintiff stated that, "The only thing I do is comb her hair." (Tr. 33).

Plaintiff testified that she or her boyfriend walked her daughter to the bus stop each morning. (Tr. 34). This walk is "about sixty-eight steps." (Tr. 32). Plaintiff stated that she could not walk further than this distance because when she got to the bus stop, she had to sit down to rest her back and hip. (Tr. 34, 36). Plaintiff testified that her boyfriend walked her daughter to the bus stop "ninety percent of the time." (Tr. 35). Because plaintiff did not have a drivers' license, either her mother drove her or she took public transportation wherever she needed to go. (Tr. 35).

Plaintiff stated that she believed she could lift "about five pounds" because "my hands hurt when I pick it up" and "it pulls into my back." (Tr. 36). Plaintiff testified that she believed she could stand in one place for only "five to ten minutes" because "my back gets tired, my legs get tired. I have to sit down. And then what happens is my back . . . locks." (Tr. 36). Asked if she was having trouble sitting while testifying at the hearing, plaintiff stated that she was, and for that reason she

was rocking to keep her "back from locking up." (Tr. 37).

When asked about her conditions' effect on her sleep, plaintiff testified that she would wake up "every night in the middle of the night," needing to get up and take medication to relieve the pain. (Tr. 38). As a result, plaintiff stated, she was tired in the morning. (Tr. 38). She also testified that she wears a lower back brace to sleep. (Tr. 39).

Plaintiff stated that during the day, she took her daughter to the bus and "[o]therwise, you know, I watch TV. I relax. I sit, you know, with some pillow. Pretty much not, not too much." (Tr. 39). She testified that she could not go on vacations, even travel to Boston, because "my back and my legs would hurt and then I'd be in a lot of pain." (Tr. 39).

Concerning past employment, plaintiff testified that she worked as a receiver at Bradlee's, pulling pallets, scanning inventory and putting it into a computer." (Tr. 41). At this job, she was on her feet seven hours a day and would lift "different variety of weight, depending on what the merchandise was." (Tr. 41). She stated that she could not do that type of work anymore because "my back and my body cannot handle that." (Tr. 42). Plaintiff described her next job, as a pre-school teacher at the YMCA, testifying that she had to be on her feet "ninety-five percent of the time." (Tr. 43). She stated that she could not do this type of work anymore because "I can't sit on the

floor with the kids. I can't take them for walks. I can't . . . do ring around the roses with them. I can't do a lot of things that is required for that job as a teacher." (Tr. 43). For similar reasons, plaintiff testified she could no longer run a home daycare. (Tr. 43).

When asked if there was any other type of work that she thought she could do, plaintiff stated "No, because that is the only thing that I know how [to do]." (Tr. 44). She stated she could not even have a sedentary job, where she could stand or sit at will (i.e. watching a wall of monitors for security purposes) because "I can't stand too long and I can't sit too long before everything bothers me." (Tr. 44). This would be true even with pain medication, the plaintiff testified, because "it works for a short period of time and then it just goes away, and . . . it'd be just double the pain." (Tr. 44).

Vocational Expert's Testimony

Renee Jubree, a vocational expert, also testified at the hearing. (Tr. 50). First, Jubree gave an opinion based on an individual the same age and with the same education and vocational background as plaintiff. (Tr. 50). This hypothetical individual was described as being limited to lifting ten pounds frequently, twenty pounds occasionally, sitting for six out of eight hours a day, standing for six out of eight hours a day, occasionally climbing ramps and stairs, and occasional balancing, stooping,

kneeling, crouching and crawling. (Tr. 51). Jubree stated that an individual with these skills would be able to run a home daycare and teach at a pre-school. (Tr. 51-52).

The ALJ then asked Jubree to consider another hypothetical individual the same age and with the same educational and vocational background as the plaintiff with the same limitations as in the first hypothetical plus an additional limitation that the individual could only frequently push and pull with the left extremity. (Tr. 52). In response, Jubree testified that this additional limitation would preclude any of the plaintiff's past relevant work. (Tr. 52). However, she testified that the second hypothetical individual could perform certain types of assembly jobs, particularly "assembler, small products 1" with 410 regional positions; "assembler, small products 2" with 250 regional positions; and "assembler of plastic hospital products" with 250 regional positions. (Tr. 53). Jubree testified that all of these positions were unskilled. (Tr. 53).

Finally, the AlJ posited a third hypothetical individual with the same limitations as the second, but additionally limited to occasional handling and fingering with the left upper extremity. (Tr. 53). Jubree testified that although the "DOT does not carve out left and right extremity," because the three above positions require "the use of bilateral hands," with this additional limitation, the third hypothetical individual would not be able to

23

do the actions required by the three assembler positions, even given the fact that the limitation would only impair the non-dominant hand. (Tr. 53-54).

The plaintiff's attorney asked Jubree whether it was her understanding that all three hypothetical individuals could lift ten pounds frequently and twenty pounds occasionally; Jubree confirmed. (Tr. 56). The attorney then asked Jubree to return to the second hypothetical individual, this time assuming instead an ability to lift only five pounds frequently and ten pounds occasionally. (Tr. 57). Jubree responded that with this additional limitation, only the "assembler of plastic hospital products", consisting of 250 regional positions, would be possible. (Tr. 57). Next, the attorney asked Jubree to assume that this hypothetical individual was unable to lift more than five pounds. (Tr. 58). Jubree responded that this would rule out even the "assembler of plastic hospital products" position. (Tr. 58).

## ALJ'S FINDINGS

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. <u>See</u> 42 U.S.C. § 423(a)(1)(E). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A).

Determining whether a claimant is disabled requires a five-step process. See 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. § 404.1520(a)(4)(I). If the claimant is currently employed, the claim is denied. See 20 C.F.R. § 404.1520(b). If the claimant is not currently employed, the ALJ must continue to the second step, making a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. See 20 C.F.R. § 404.1520(c). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. See 20 C.F.R. § 404.1520(d); Bowen v. Yuckert, 482 U.S. 137, 163 (1987); Balsamo v. Charter, 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. See 20 C.F.R. § 404.1520(d); see also Balsamo, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work. See 20 C.F.R. § 404.1520(e)-(f). If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. See Balsamo, 142 F.3d at 80 (citations omitted). Accordingly, a

claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. See 20 C.F.R. §404.1520(f); see also Balsamo, 142 F.3d at 80 (citations omitted).

Following the five step evaluation process, ALJ Thomas found that plaintiff had not engaged in any substantial gainful activity since March 1, 2005, the alleged onset date. (Tr. 9); see 20 C.F.R. § 404.1520(a)(4)(ii) & (b). ALJ Thomas then concluded that the medical evidence supported a finding that the claimant has severe impairments, including hypertrophic hip spurs, lumbar disc disease, carpal tunnel syndrome, and obesity. (Tr. 9); see 20 C.F.R. §§ 404.1520(c) and 416.920(c). However, he found that the alleged arthritis, diabetes mellitus, and hyptertension are not severe.[15] (Tr. 10); see 20 C.F.R. §§ 404.1520(c) and 416.920(c).

In the third step of the evaluation process, ALJ Thomas concluded that plaintiff does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments found in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 10); see 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1426, 416.920(d), 416.925 and 416.926.

The ALJ determined that plaintiff has the RFC to perform

---

[15]Plaintiff does not address these conditions as disabling in her brief. [Doc. # 10].

light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that the plaintiff is limited to only frequent pushing and pulling with her left arm. (Tr. 11). Further, he determined that she can sit for six hours out of an eight-hour day, and stand and/or walk for two hours out of an eight-hour day; she can occasionally climb stairs and ramps, balance, kneel, crouch, and crawl. (Tr. 11). Finally, the plaintiff is limited to frequent handling and fingering with her left arm and hand and has no limitation on her right arm and hand. (Tr. 11). ALJ Thomas found that

> the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements about the intensity, persistence, and limiting effects are only partially credible to the extent they are inconsistent [with] the objective medical evidence and the claimant's prior statements.

(Tr. 12).

ALJ Thomas cited several reasons for finding plaintiff's statements about intensity, persistence and limiting effects only partially credible. (Tr. 12). First, he noted that plaintiff's medical evidence ceased in March 2007, twenty-one months prior to the hearing on the claim. (Tr. 12). Second, he found that the plaintiff's testimony regarding her activities of daily living was inconsistent with the severity of the pain and degree of impairment she alleged and also inconsistent with her written statements in the Activities of Daily Living Report. (Tr. 12).

Third, he wrote that the objective medical evidence did not support the degree of functional limitation alleged with regard to her hip and back pain because the hip spurs were described as small, marginal, and minimal; the degenerative changes to the plaintiff's lumbar spine were described as mild; and while the plaintiff's EMG results revealed a moderate neuropathy in her left wrist, the plaintiff's treatment records were sparse and suggested a pattern of infrequent appointments with her primary care physician in which she intermittently complained of pain inconsistent with the intensity of pain she described. Finally, beyond medication, plaintiff appeared not to have pursued any other treatment methods. (Tr. 12).

ALJ Thomas next considered the opinion evidence. (Tr. 12). He gave greater weight to the case analysis of Agency Physician Dr. Goldfine because it was consistent with the objective medical record. (Tr. 12). He gave some weight to the opinion of treating physician Dr. Murcia, particularly her belief that the plaintiff would be able to return to sedentary work at some point in the future. (Tr.12). He credited the portion of her opinion regarding plaintiff's eventual return to the workforce but found that the objective medical record and Dr. Murcia's own treatment notes did not support a limitation to sedentary work. (Tr. 12).

In the fourth step of the evaluation, ALJ Thomas also considered the opinion evidence to see whether plaintiff could

perform her former work.  (Tr. 13); <u>see</u> 20 C.F.R. §
404.1520(e)-(f).  The ALJ concluded that plaintiff is unable to
perform any of her past relevant work as a childcare monitor, YMCA
teacher, home health aide, or receiving clerk, due to her
limitation to do only light exertional work.  (Tr. 13).

For the fifth and final step of the evaluation, ALJ Thomas
concluded that plaintiff is limited to light work impeded by
additional limitations. (Tr. 14); <u>see</u> 20 C.F.R. §§ 404.1520(g),
416.920(g).  Based on the testimony of the vocational expert, the
ALJ concluded that, considering plaintiff's age, education, work
experience, and RFC, she is capable of making a successful
adjustment to other work that exists in significant numbers in the
national economy, and therefore plaintiff has not been under a
"disability," as defined by the Social Security Act, at any time
since her alleged onset of disability.  (Tr. 14).

<u>DISCUSSION</u>

Plaintiff asserts the following errors on appeal.

1.   The ALJ failed to give proper weight to Dr. Murcia's and Dr.
     Goldfine's opinions.

2.   The ALJ failed to sufficiently satisfy his duty to develop
     the record.

3.   The ALJ failed to sufficiently explain his credibility
     finding.

4.   The ALJ failed to give proper consideration to all of the

medical evidence in the record to determine plaintiff's RFC. [Doc. #10 at 12].

### 1. Dr. Murcia's and Dr. Goldfine's Opinions

Plaintiff argues that, in assessing her physical conditions, the ALJ "improperly affords 'greater' weight to the case analysis completed by Dr. Lewis Goldfine of the DDS" than to the opinion of treating physician, Dr. Eva Murcia, in direct contravention of the Treating Physician Rule. [Doc. #10 at 8]. ALJ Thomas wrote that he gave "some weight" to the opinion of Dr. Murcia and "greater weight" to the case analysis of Dr. Goldfine because it was "consistent with the objective medical record." (Tr. 12). The Court agrees.

Generally, a medical opinion from a claimant's treating physician is given significant weight because a treating physician is likely to be the medical professional most able to provide a detailed, longitudinal picture of claimant's medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone. 20 C.F.R. § 404.1527(d)(2) (2006). However, in order for a treating source's opinion to be given controlling weight, two requirements must be met: the nature and severity of impairments must be well-supported by medically acceptable clinical and laboratory diagnostic techniques and the opinion must not be inconsistent with the other substantial evidence in the case record. 20 C.F.R.

§ 404.1527(d)(2); see also Halloran v. Barnhart, 362 F.3d 28, 32

(2d Cir. 2004). If a treating source's opinion does not meet

these requirements, an ALJ must consider various "factors" to

determine how much weight to give to that opinion.[16] 20 C.F.R. §

404.1527(d)(2)(i-ii), (3),(6); see also Halloran, 362 F.3d at 32;

see also Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

Dr. Murcia's Opinion:

The Social Services Medical Report (Tr. 231-233) completed by

Dr. Murcia should not be given controlling weight because it is

not "well supported" by medically acceptable clinical or

laboratory diagnostic techniques, and it is inconsistent with

other substantial evidence in the case record, demonstrated by the

results of multiple x-rays, MRIs and an EMG.

On February 18, 2005, Dr. Iloje ordered an x-ray of

plaintiff's spine; results indicated no abnormalities. (Tr. 230,

---

[16] Among those factors are: (i) the frequency of examination
and the length, nature and extent of the treatment relationship;
(ii) the evidence in support of the treating physician's opinion;
(iii) the consistency of the opinion with the record as a whole;
(iv) whether the opinion is from a specialist; and (v) other
factors brought to the Social Security Administration's attention
that tend to support or contradict the opinion. 20 C.F.R.
§404.1527(d)(2); see also Halloran, 362 F.3d at 32. The
regulations also specify that the Commissioner "will always give
good reasons in [her] notice of determination or decision for the
weight [she] give[s] [claimant's] treating source's opinion." 20
C.F.R. §404.1527(d)(2); accord 20 C.F.R. § 416.927(d)(2); see
also Schaal v. Apfel, 134 F.3d 496, 503-04 (2d Cir. 1998)
(stating that the Commissioner must provide a claimant with "good
reasons" for the lack of weight attributed to a treating
physician's opinion).

228).  On May 20, 2005, Dr. Illoeje ordered an MRI scan of

plaintiff's lumbosacral spine; it revealed a mild diffuse disk

bulge but no disk herniation, central canal stenosis or neural

foraminal stenosis at any level.  (Tr. 217, 216).  On January 24,

2006, Dr. Iloeje ordered an x-ray of plaintiff's back after

plaintiff reported falling down stairs; results were unremarkable.

(Tr. 205, 203).  On March 22, 2006, Dr. Murcia ordered an MRI of

plaintiff's lumbar spine; it revealed multilevel disc desiccation

and a questionable small midline annular tear but no evidence of

disc herniation or nerve root impingement.  (Tr 195).

On December 21, 2006, plaintiff underwent x-rays of her left

hip and SI joint; they showed minimal degenerative change with

small marginal hypertrophic spurs, but the radiologist concluded

that the examination was "essentially negative." (Tr. 241).  On

January 13, 2007, plaintiff underwent x-rays on her hands and

wrists; they revealed no erosive changes or degenerative changes

indicative of arthritis.  (Tr. 239).  On February 5, 2007, Dr.

Murcia ordered an EMG study of plaintiff's left hand; it revealed

left median neuropathy at the wrist (e.g. carpal tunnel syndrom)

of moderate severity.  (Tr. 249).

While these diagnostic tests identify minimal impairments,

none of them, separately or together, are sufficient to support

Dr. Murcia's disability finding.  Thus, the nature and severity of

plaintiff's claimed impairments are not well-supported by

medically acceptable clinical and laboratory diagnostic techniques and are inconsistent with the other substantial evidence in the case record. See 20 C.F.R. §404.1527(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."); see also Halloran, 362 F.3d at 32 ("The opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . .").

An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various "factors" to determine how much weight to give to that opinion including: (i) the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. Halloran, 362 F.3d at 32; see 20 C.F.R. § 404.1527(d)(2). Although an ALJ should "comprehensively" provide reasons for the weight assigned to a treating physician's opinion, the failure to do so does not require remand if it can be ascertained from the entire record and the ALJ's opinion that the ALJ "applied the substance" of the treating physician rule. Botta

v. Barnhart, 475 F. Supp. 2d 174, 188 (E.D.N.Y. 2007); see
Halloran, 362 F.3d at 32-33.

After considering the entire record and the ALJ's decision,
the Court concludes that the ALJ applied the substance of the
treating physician rule in this case. Regarding the length,
nature and extent of the relationship, the record demonstrates
that plaintiff was treated by Dr. Murcia for approximately six
months, from September 20, 2006 to February 5, 2007, on nine
occasions. Most of the visits were solely for routine pain
medication refills. (Tr. 234-248); see supra pp. 13-14.
Plaintiff argues the due to her unemployed, uninsured status, "her
ability to receive extensive and appropriate medical care is
significantly compromised." [Doc. #10 at 11]. Thus, even by
plaintiff's own account, her six-month relationship with Dr.
Murcia was short and superficial.

In addition, Dr. Murcia's Social Services Medical Report
displays a clear lack of relevant evidence to support her opinion
that plaintiff is disabled. (Tr. 231-233). Although she claimed
plaintiff's disability would last for "more than three months,"
she gave no medical evidence beyond a recitation of plaintiff's
conditions to explain her conclusion, and she left blank several
questions concerning when plaintiff would be able to return to
work. (Tr. 231-233).

Furthermore, Dr. Murcia's opinion is not consistent with the

record as a whole. Plaintiff's own account of her daily living activities (Tr. 135-142) contradict Dr. Murcia's opinion in the Social Services Medical Report (Tr. 231-233). ALJ Thomas emphasized this contradiction in his decision: plaintiff admitted that she walked her daughter to and from her school bus stop, that she visited her friends and mother by walking or taking public transportation, and that she went grocery shopping for two hours at a time. (Tr. 12). ALJ Thomas also noted that plaintiff had previously reported that she cleaned, cooked, did laundry, and played with her daughter. (Tr. 12). Based on this evidence, ALJ Thomas concluded that "the claimant's broad range of activities suggest that her impairments do not impose the degree of functional limitation that she alleged at the hearing . . . ." (Tr. 12). He also concluded that "the objective medical record and Dr. Murcia's own treatment notes do not support a limitation to sedentary work," which Dr. Murcia identified in the Social Services Medical Report. (Tr. 12).

Finally, Dr. Murcia is not a specialist, nor are there any other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

After careful consideration of the entire record and the ALJ's opinion, the Court finds that the ALJ "applied the substance" of the treating physician rule in this case and properly awarded Dr. Murcia's opinion some weight, but not

35

controlling weight.

### Dr. Goldfine's Opinion:

ALJ Thomas wrote that he gave "greater weight" to Dr. Goldfine's case analysis because "it was consistent with the objective medical record." (Tr. 12). Dr. Goldfine was not a treating physician and his opinion largely summarized the medical evidence in the record, emphasizing the mild findings in plaintiff's x-rays, MRI scans, and EMG. (Tr. 252). His interpretation of plaintiff's medical tests was consistent with findings and reports completed by the doctors performing the procedures. (Tr. 252). Dr. Goldfine did not examine plaintiff and did not offer any new medical opinions about her conditions. (Tr. 252).

Dr. Goldfine accurately summarized the objective medical evidence in the record, and the ALJ reasonably relied on this summary. However, it is the sole responsibility of the ALJ to weigh all of the medical evidence and resolve any material conflicts in the record. See Stevens v. Barnhard, 473 F. Supp. 2d 357, 364 (N.D.N.Y. 2007) (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)). Here, ALJ Thomas ultimately predicated his disability determination on the objective medical evidence consistent with plaintiff's self-report on the Activities of Daily Living form.

The Court finds that the ALJ gave proper weight to Dr. Murcia

and Dr. Goldfine's opinions in reaching his decision.

   2.   ALJ's Duty to Develop the Record

   Plaintiff alleges that the ALJ failed to fully and fairly develop the record and, consequently, the case must be remanded. Plaintiff argues that the ALJ "merely rel[ied] on the non-examining source opinion and fail[ed] to call a medical expert." [Doc. #10 at 12].   Plaintiff asserts that the ALJ should have called a medical expert, "given plaintiff's uninsured status and the paucity of available narrative medical evidence." [Doc. #10 at 12].

   A claimant is entitled to "a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act." Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982) (quoting Gold v. Sec'y of Health, Ed. & Welfare, 463 F.2d 38, 43 (2d Cir. 1972)).   In light of the essentially non-adversarial nature of a Social Security disability hearing, the Commissioner has an obligation to develop a complete medical record before making a decision. See Wright v. Barnhart, 3:05CV1487(SRU)(WIG), 2006 WL 4049579, *15 (D. Conn. Dec. 14, 2006) (citing Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996)).   Specifically, the Commissioner must make every reasonable effort to develop a complete medical history for at least the twelve months preceding the month in which claimant files her application.   20 C.F.R. § 404.1512(d)(2006). "Complete medical

history" is defined as the records of claimant's medical source(s) covering at least the twelve months preceding the month in which she filed her application. 20 C.F.R. § 404.1512(d)(2).

Plaintiff filed an application for Supplemental Security Income Benefits ("SSI") and Disability Insurance Benefits ("DIB") on January 8, 2007. (Tr. 118-124, 125-130). Therefore, ALJ Thomas had the duty to make every reasonable effort to develop a complete medical history from at least January 8, 2006 to January 8, 2007. See 20 C.F.R. § 404.1512(d); (Tr. 118-124, 125-130).

Included in the record are Dr Iloeje's progress notes from February 17, 2005 through November 2, 2006 (Tr. 196-230); and Dr. Murcia's progress notes from September 20, 2006 through February 5, 2007 (Tr. 234-248). In addition to progress notes from plaintiff's treating physicians spanning almost two years prior to plaintiff's application for disability (Tr. 196-230, Tr. 234-248), the record also includes results from five diagnostic tests prior to her application filing date, January 8, 2007[17], and two

---

[17]On February 18, 2005, Dr. Iloje ordered an x-ray of plaintiff's spine; results indicated no abnormalities. (Tr. 230, 228). On May 20, 2005, Dr. Iloeje ordered an MRI scan of plaintiff's lumbosacral spine; it revealed a mild diffuse disk bulge but no disk herniation, central canal stenosis or neural foraminal stenosis at any level. (Tr. 217, 216). On January 24, 2006, Dr. Iloeje ordered an x-ray of plaintiff's back; results indicated no abnormalities. (Tr. 205, 203). On March 22, 2006, Dr. Murcia ordered an MRI of plaintiff's lumbar spine; it revealed multilevel disc desiccation and a questionable small midline annular tear but no evidence of disc herniation or nerve root impingement. (Tr 195). On December 21, 2006, plaintiff underwent x-rays of her left hip and SI joint; they showed

subsequent tests[18]. A record consisting of seven diagnostic tests and two years of physician progress notes is sufficient to meet the ALJ's duty to create a "complete medical history" as required by the Social Security Administration. See 20 C.F.R.§ 404.1512(d)(2). Because there is "little indication in the record suggesting a disabling condition during the period in question," the ALJ has no obligation "to develop the record further." Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

The Social Security Act provides that a court may order the Secretary to consider additional evidence, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. §405(g) (1982). Thus, an appellant must show that the proffered evidence is (1) "'new' and not merely cumulative of what is already in the record," Szubak v. Sec'y of Health & Human Servs., 745 F.2d 831, 833 (3d Cir. 1984), and that it is (2) "material, that is, both relevant to the claimant's condition during the time period for

---

minimal degenerative change with small marginal hypertrophic spurs, but the radiologist concluded that the examination was "essentially negative." (Tr. 241).

[18]On January 13, 2007, plaintiff underwent x-rays on her hands and wrists; they revealed no erosive changes or degenerative changes indicative of arthritis. (Tr. 239). On February 5, 2007, Dr. Murcia ordered an EMG study of plaintiff's left hand; it revealed left median neuropathy at the wrist (e.g. carpal tunnel syndrom) of moderate severity. (Tr. 249).

which benefits were denied and probative," <u>Tirado v. Bowen</u>, 842 F.2d 595, 597 (2d Cir. 1988). Finally, claimant must show (3) "good cause for her failure to present the evidence earlier." <u>Id.</u> Although the ALJ specifically asked plaintiff and her counsel at the hearing about any additional, recent medical treatment (Tr. 45-47), plaintiff's counsel did not indicate at the hearing that Dr. Najuko's treatment notes or anything else should be included in the record, nor does plaintiff allege in her brief that there was medical evidence missing from the record. [Doc. #10]. Thus, plaintiff has not met her burden to show that the Secretary must consider any additional evidence not already present in the record.

Finally, plaintiff's contention that the ALJ erred in not further developing the record warrants little discussion given the Court's conclusion that the ALJ accorded Dr. Murcia's opinion proper weight. Where, as here, there is "little indication in the record suggesting a disabling condition," the ALJ did not err in his obligation to "to develop the record further." <u>Schaal</u>, 134 F.3d at 505.

   3.   <u>ALJ's Credibility Assessment</u>

The function of the Commissioner includes evaluating the credibility of all witnesses, including the claimant. <u>See</u> <u>Carroll v. Sec'y of Health & Human Servs.</u>, 705 F.2d 638, 642 (2d Cir. 1983). Although the Commissioner is free to accept or reject the

testimony of any witness, a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1998) (citing Carroll, 705 F.2d at 643). The ALJ's findings must be consistent with the other evidence in the case. Williams 859 F.2d at 261; see also 20 C.F.R. §§ 404.1529(a) and 416.929(a).

In making a disability determination, all symptoms, including pain, must be considered. See 20 C.F.R. § 404.1529(a). To evaluate subjective symptoms, a claimant's statements are to be considered only to the extent that they are consistent with medical evidence. See 20 C.F.R. §§ 404.1529(a), 416.929(a). However, statements about the intensity and persistence of pain and symptoms will not be rejected simply because the objective medical evidence does not support the claim. See 20 C.F.R. § 404.1529(c)(2). Other factors which will be considered include the claimant's medical history, diagnoses, daily activities, prescribed treatments, efforts to work, and any functional limitations or restrictions caused by the symptoms. See 20 C.F.R. § 404.1529(c)(3). In addition,

> [t]he determination or decision must contain
> specific reasons for the finding on
> credibility, supported by evidence in the case
> record, and must be sufficiently specific to
> make clear to the individual and to any
> subsequent reviewers the weight the
> adjudicator gave to the individual's
> statements and the reasons for that weight.

SSR 96-7p[19].

The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 12). However, he did not find plaintiff's statements about the intensity, persistence, and limiting effects fully credible. (Tr. 12). In making this determination, he cited specific reasons from plaintiff's medical history, diagnoses, daily activities, and prescribed treatments. (Tr. 11-12). The ALJ found that

> Although the claimant alleges severe and constant pain for which she presently receives treatment, the medical evidence before me ceases in March 2007, twenty-one months prior to the hearing on this claim. In addition, the claimant's testimony regarding her activities of daily living is inconsistent with the severity of the pain and degree of impairment she alleges. The claimant testified she lives with her boyfriend and nine year-old daughter. Although the claimant testified at the hearing that her nine year-old child was old enough to take care of herself except for combing her hair, the claimant previously reported that she cleans, cooks, washes clothes for her, helps her with homework, gets her ready for school, and plays with her . . . . In her Activities of Daily Living Report, the claimant indicated that she went out on a daily basis and went grocery shopping once a month for two hours at a time. The claimant's broad range of activities suggest that her impairments do not impose the degree of functional limitation that she alleged at the hearing and, as a result, I find her testimony only partially credible.

---

[19] Available at
http://www.ssa.gov/OP_Home/rulings/di/01/SSR96-07-di-01.html.

42

(Tr. 11-12).

The ALJ's finding of functional limitation but no disability is consistent with the medical record, despite plaintiff's allegations to the contrary. Therefore, the Court agrees with the ALJ's applications of the legal principles regarding plaintiff's credibility and finds that the ALJ relied upon substantial evidence to arrive at his finding of no disability.

    4.   <u>ALJ's Residual Functional Capacity Assessment</u>

Plaintiff next argues that "though the medical evidence is somewhat sparse[. . .], it nevertheless demonstrates plaintiff's impairments and RFC and corroborates her symptoms. This evidence is entitled to controlling weight per the applicable Social Security Regulations 96.8p and 96.9p." [Doc. #10 at 11]. Plaintiff contends that her treating physician and care providers "did offer substantial, documented proof of her impairments and resulting disability" [Doc. #10 at 11], specifically citing Exhibit 4F, the Social Services Medical Report completed by Dr. Murcia on January 16, 2007 (Tr. 231-233), and Exhibit 7F, a clinic visit note written by Dr. Sheikh Ahmed dated March 14, 2007 (Tr. 251).

The ALJ must determine the claimant's RFC in order to complete steps four and five of the sequential evaluation process. <u>See</u> 20 C.F.R. § 404.1520(b-f)(2006). If the ALJ's determined RFC conflicts with an opinion from a medical source, he must explain

43

why the opinion was not adopted.  (SSR 96-8p[20]).  Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight.  <u>Id.</u>  If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the adjudicator must give it controlling weight.  <u>Id.</u>

The ALJ properly gave the Social Services Medical Report completed by Dr. Murcia only "some weight" for the reasons already discussed in this opinion.  Exhibit 7F is a clinic visit note from Dr. Sheikh Ahmed discussing dermatitis that plaintiff contracted in March, 2007.  (Tr. 231).  It does not, as plaintiff claims in her brief, document her "chronic pain," "obesity," and "back/hip and knee pain."  (Tr. 231).

Plaintiff's contention that ALJ Thomas erred in this regard merits little discussion in light of our conclusion above that the ALJ was not compelled to give controlling weight to the contrary opinion of Dr. Murcia and plaintiff's inaccurate description of Dr. Ahmed's clinic visit note.  Given the significant medical evidence supporting the ALJ's findings, plaintiff has not shown that the ALJ

---

[20]<u>Available at</u>
http://www.socialsecurity.gov/OP_Home/rulings/di/01/SSR96-08-di-01.html

failed to follow <u>SSR</u> 96-8p and <u>SSR</u> 96-9p or that the ALJ either misread or failed to consider facts in the record.  The Court finds that the ALJ properly relied upon the record as substantial evidence for his findings.

<u>CONCLUSION</u>

Plaintiff's Motion for an Order Reversing the Decision of the Commissioner **[Doc. #10]** is **DENIED,** and defendant's Motion to Affirm the Decision of the Commissioner **[Doc. #13]** is **GRANTED.**

Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days of the receipt of this order.  Failure to object within fourteen (14) days may preclude appellate review.  <u>See</u> 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 2 of the Local Rules for United States Magistrates; <u>Small v. Sec'y of Health & Human Servs.</u>, 892 F.2d 15 (2d Cir. 1989) (per curiam); <u>FDIC v. Hillcrest Assoc.</u>, 66 F.3d 566, 569 (2d Cir. 1995).

ENTERED at Bridgeport this (2 day of August, 2010.

/s/ Holly B. Fitzsimmons, USMJ.

HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE